UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:18-cv-00281-FDW

DAVID SCHNEBELEN,                          )
                                           )
        Petitioner,                        )
                                           )
vs.                                        )          **ORDER**
                                           )
KENNETH BEAVER,                            )
                                           )
        Respondent.                        )
_____)

**THIS MATTER** is before the Court upon Respondent's Motion for Summary Judgment

(Doc. No. 14) and Petitioner David Schnebelen's pro se Petition for Writ of Habeas Corpus, filed

pursuant to 28 U.S.C. § 2254 (Doc. No. 1).

I.      **BACKGROUND**

On May 5, 2014, a Burke County Grand Jury indicted Petitioner on one count of

manufacturing methamphetamine in violation of N.C.G.S. § 90-95(a)(1) and two counts of

possession of an immediate precursor chemical (hydrochloric acid and acetone) knowing or

having reasonable cause to believe it would be used to manufacture methamphetamine in

violation of N.C.G.S. §§ 90-95(a)(1),(b)(1a), and (d1)(2). The indictment alleged three factors in

aggravation including that a minor resided on the property used for the manufacture of

methamphetamine.

Defense counsel filed several pretrial motions including: (1) Motion to Continue; (2)

Motion for Discovery; (3) Motion to Compel Criminal Discovery Requests; (4) Motion to

Suppress and Supporting Affidavit; (5) Supplemental Affidavit in Support of the Motion to

Suppress; (6) Motion to Suppress Statements; (7) Motion to Suppress Based on Insufficient

1

Corroboration of Information; (8) Motion to Suppress Based on Timeliness Issue; and (9)

Supplemental Motion to Suppress Statements. On March 30-31, 2015, the Honorable Carla N.

Archie ("Judge Archie"), Superior Court Judge presiding, conducted evidentiary hearings on the

pretrial motions. At the conclusion of the hearing on Petitioner's discovery and continuance

motions, Judge Archie found insufficient evidence "to suggest the existence of camera footage or

audio-video files or any additional dispatch records beyond what has been previously provided"

and denied the discovery motions as moot or otherwise unsubstantiated. Mar. 30-31, 2015 Hr'g

Tr. (Doc. No. 16-3), at 43. She also denied Petitioner's motion to continue. See id. At the

conclusion of the suppression hearing, Judge Archie made findings of fact and conclusions of

law in open court and denied the motions to suppress, see id. at 149-154, and in an Order filed

April 15, 2015, she entered written findings of fact and conclusions of law in support of her

decision, see Order on Suppress. Mots., R. on Appeal (Doc. No. 16-2), at 60-63.

On March 31, 2015, after Judge Archie announced her decision on the suppression

motions, Petitioner pled guilty to all charges in exchange for dismissal of the aggravating factors

and an active consolidated sentence of 110-144 months. The parties stipulated to Petitioner's

Prior Record Level points and Prior Record Level. During the plea proceedings, District

Attorney Frank A. Webster ("ADA Webster"), summarized the factual basis for the plea as

follows:

> Sarah Jordan is a loss prevention officer at Walmart. She is the -- is the subject
> matter of his misdemeanor larceny conviction here in Burke County back in March
> of 2014. She notified the Burke County Narcotics Task Force that this individual
> was stealing things that were consistent with the manufacturing of
> methamphetamine. So this is what put him on their radar.
>
> They, as you heard, checked the pseudoephedrine logs. There was purchases
> between him and his codefendant, Jodi Brown, that indicated that this was an
> excessive amount of pseudoephedrine being purchased. They were in the process

2

of securing a search warrant. In fact, Investigator Dellinger with the task force was in the process of doing what they call a trash-pull. The local trash maintenance people somehow got their orders crossed and that didn't happen. But that was set to happen at a -- at a future date.

Well, what happened in the interim, as you heard, Mark Mitchell, who is an individual that was at this residence participating in the using of methamphetamine and probably the manufacture as well -- which is why he was knowledgeable of it -- something happened on that day that scared even him. And the fact that there was an eight-year-old at the residence caused him to come to his sentences and realize, "This is dangerous. I, I ain't somebody that's going to rat on people, but at the same time there's an eight-year-old child here at stake."

So he made a phone call to -- which, because it was -- It was a Morganton address; 205 Jefferson Street is here in Morganton city limits. It's just down the road that way about a mile or so. That call was routed through Morganton Department of Public Safety. Sergeant Whisnant took that call. He was willing to give his name, his phone number, and what he observed and the dangers he felt like associated with it.

That phone call was then routed to Investigator Dellinger, who happened to be -- it was a Saturday – he happened to be out of town with his family. And he was not in position to immediately respond to that. So he set things in motion to come back. But in the meantime it was going to take him a couple hours to get back -- he called Special Agent Chambliss. Special Agent Chambliss then applied for the search warrant that you're aware of; Judge Ervin signed it; they executed it.

What other evidence that would've come out at trial is, is that in the course of this back and forth of speaking to Mr. Schneb -- Schnebelen, the defendant, with -- that you heard from Officer Chambliss, in one of those conversations, he said, "Look, she didn't have nothing to do with this, that it's my meth lab and you can't charge her. She didn't do anything about this."

The evidence that was seized inside the home was based on their all training and experience plus another officer who would've testified who's even more of a specialist, so to speak, than anybody else, as I'm told, about meth labs. And he's an expert with the SBI and works clandestine meth labs.

He would absolutely be able to say this three-page list of things, that we would've gone through with him, that were taken out of the house -- yes, each and every one of those things in and of themselves are household items that we all probably have in our house, such as nail polish, which is the acetone, which is one of the precursors he's pled guilty to. Muriatic acid or hydrochloric acid, a common thing people may keep in their sheds or in their garage to clean things with.

3

The one thing, though, that, that I found, what I thought was one of our best pieces of evidence in a picture that the jury would've gotten to see, is in the trash is over 200 matchbooks. Now, who buys -- and there's a receipt from two days before where they bought matches at Ingles. Who buys this many matches and then throws them away? Well, they remove the striker plate, which is for the red phosphorus. So there's also pictures of all these striker plates from the matches. That would've been introduced into evidence.

So all these things taken together would've been sufficient evidence for the jury to find beyond a reasonable doubt that there was a meth lab being -- there was meth being manufactured at that residence on that day, the date of offense, as well as these two precursor chemicals.

The last piece of evidence -- the, the actual motion that we heard on the motion to suppress, the actual statement that he made, in addition to the spontaneous statement he made there at the scene that it's his meth lab, not hers. He was, he was very conscious of the fact that he did not want Ms. Brown to be charged with anything. Of course, as you heard, they made him no promises.

He said, initially, that this lab was started by somebody named Stephen; he didn't know the last name. Him and Jodi had moved to North Carolina in the timeframe, end of January. They initially stayed at the Days Inn. That's where he met Mark Mitchell. Mark Mitchell became a hook-up for Jodi to get hydrocodone pills. And it was through Mark Mitchell that they met Stephen, last name unknown.

He began to buy pseudoephedrine for the manufacturing of methamphetamine. He said he knew how to cook methamphetamine. He admitted his involvement to being involved in cooking methamphetamine at that -- at that residence. He said the first time he cooked at that residence was March of 2014. He said the last time he cooked was that, that, that night, the day they were there, April 12th, 2014.

He was very specific about -- there was 8.4 grams of iodine crystals, which were also found at the residence; 4.2 grams of ephedrine powder, which he referred to as "white powder"; and 6.3 grams of red phosphorus. This yielded a cook of less than two grams of methamphetamine. He admitted that he was addicted to methamphetamine. He admitted that he and Jodi used methamphetamine. They both tried to mitigate the involvement of the child being at the residence when methamphetamine was cooked.

As you'll hear tomorrow, I believe, Ms. Brown, who is in the courtroom, who's the codefendant, she pled guilty to two counts of precursors. We dismissed her methamphetamine manufacturing charge. In exchange she was going to testify. And, of course, this was all in the court file, with notices, appropriate notices, according to the statute, because it's clearly exculpatory evidence.

4

> She would've testified that basically she didn't know how to cook, that he did, that she was a user, that she did supply pseudoephedrine, and that her eight-year-old daughter resided in the home while methamphetamine was being cooked at some points.

Mar. 30-31, 2015 Hr'g Tr. (Doc. No. 16-3), at 162-67 (verbatim).

In accordance with the plea agreement, Judge Archie consolidated the offenses and sentenced Petitioner in the presumptive range to 110-144 months imprisonment. Defense counsel filed a timely notice of appeal for Petitioner on April 2, 2015.

Petitioner's appointed appellate counsel filed an <u>Anders</u> brief on his behalf in which she stated she was unable to identify an issue with merit to support a meaningful argument for relief on appeal, <u>State v. Schnebelen</u>, 788 S.E.2d 681 (N.C. Ct. App. 2016), but listed three potential claims that might arguably support the appeal, including the trial court's rejection of Petitioner's motion to suppress, <u>see</u> Def.-Appellant's Br. (Doc. No. 16-4), at 16-19. Petitioner filed a pro se appellate brief in which he argued that the trial court erred by denying his motions to suppress and that trial counsel was ineffective for failing to preserve Petitioner's right to appeal denial of his motions to suppress. <u>See</u> Def.-Appellant's Pro se Br. (Doc. No. 16-5).

The North Carolina Court of Appeals ("NCCOA") found Petitioner had not properly preserved his right to appeal the denial of his motions to suppress and dismissed his pro se arguments on that issue. <u>See</u> <u>Schnebelen</u>, 788 S.E.2d 681. The NCCOA also dismissed Petitioner's pro se ineffective assistance of counsel argument without prejudice to his right to seek post-conviction relief from the trial court. <u>See</u> <u>id.</u> Then, the NCCOA concluded: "In accordance with <u>Anders</u>, we have fully examined the record to determine whether any issues of arguable merit appear therefrom. We have been unable to find any possible prejudicial error and conclude that the appeal is wholly frivolous." <u>Id.</u> Petitioner did not seek discretionary review in

5

the Supreme Court of North Carolina.

On November 7, 2016, Petitioner filed a pro se Motion for Appropriate Relief ("MAR") in Burke County Superior Court. The court granted Petitioner an evidentiary hearing on seven of his MAR claims and sub-claims and denied the remaining 19. See Initial MAR Order (Doc. No. 16-9). The court appointed counsel to represent Petitioner at the evidentiary hearing.

On October 20, 2017, Petitioner, through counsel, filed an Amended Motion for Appropriate Relief ("AMAR") (Doc. No. 16-10), requesting the trial court reconsider three claims it had previously denied. On November 21, 2017, the court conducted an evidentiary hearing on Petitioner's MAR and AMAR. The court entered a written order on March 19, 2018 (Doc. No. 16-1), denying Petitioner's remaining claims. Petitioner filed a pro se certiorari petition ("PWC") in the NCCOA on August 28, 2018 (Doc. No. 16-13, seeking review of the orders denying his MAR and AMAR. The PWC was denied on September 5, 2018, see Doc. No. 16-14.

Petitioner filed his § 2254 Petition in this Court on October 2, 2018. Respondent has filed a Motion for Summary Judgment (Doc. No. 14), and Petitioner has filed an Amended Response (Doc. Nos. 19, 23).

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits a federal court's ability to grant habeas corpus relief to state prisoners. Under AEDPA, federal courts may not grant relief on a habeas claim that has been adjudicated on the merits in a state court proceeding unless the state court's determination "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the

6

facts in light of the evidence presented in the State court proceeding[,]" id. § 2254(d)(2).  A state court's decision constitutes an unreasonable application of clearly established federal law under § 2254(d)(1) when the state court correctly identifies the "governing legal principle . . . but unreasonably applies that principle to the facts of the . . . case."  Barnes v. Joyner, 751 F.3d 229, 238 (4th Cir. 2014) (citation omitted).  In making this assessment, the Court looks "to whether the state court's application of law was objectively unreasonable and not simply whether the state court applied the law incorrectly."  Id. at 238-39 (citation omitted).

For a state court's factual determination to be held unreasonable under § 2254(d)(2), "[the determination] must be more than merely incorrect or erroneous."  Williams v. Stirling, 914 F.3d 302, 312 (4th Cir. 2019) (citation omitted).  The state court's finding must be "sufficiently against the weight of the evidence that it is objectively unreasonable."  Id. (citation omitted).  AEDPA also provides that "a determination of a factual issue made by a State court shall be presumed to be correct" absent "clear and convincing evidence" to the contrary.  28 U.S.C. § 2254(e)(1).  These provisions of AEDPA, "operating in tandem," require that a petitioner seeking relief under § 2254(d)(2) establish that the state court's factual finding was "incorrect by clear and convincing evidence, and that the corresponding factual determination was objectively unreasonable in light of the record before the court."  Merzbacher v. Shearin, 706 F.3d 356, 364 (4th Cir. 2013) (quoting Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (internal quotation marks omitted)).

## III.    DISCUSSION

Petitioner raises the following grounds for relief:  (1) police failed to establish the reliability of the information or source of the information relied upon to establish probable cause for the search warrant; (2) the search warrant relied on false and misleading information in

7

establishing the target of the search warrant, and the probable cause for the search warrant; (3) Petitioner's statements to officers were not voluntary; (4) Petitioner was denied exculpatory evidence supporting his claim that officers searched Petitioner's residence prior to obtaining a search warrant; (5) prosecutorial misconduct, deprivation of compulsory process, deprivation of due process, ineffective assistance of counsel; (6) ineffective assistance of counsel due to failure to investigate and file subpoenas in a timely manner, improper handling of Petitioner's Fourth Amendment claims; (7) ineffective assistance of counsel due to failure to preserve appellate rights; (8) absolute deprivation by the trial court of compulsory process to obtain witnesses and evidence favorable to the defense, deprivation of due process; (9) ineffective assistance of counsel for failure to convey a plea counter-offer, deprivation of due process; and (10) ineffective assistance of counsel due to conflict of interest, deprivation of due process. As is evident, some of these grounds for relief contain sub-claims.

The Petition and accompanying Memorandum in Support ("Memorandum" or "Mem.") (Doc. No. 2) are extremely repetitive. Most of the grounds for relief rely on the same sets of facts, and Petitioner purports to re-raise claims in one ground for relief that he addresses in others. To impose some semblance of order to Petitioner's claims without being repetitive itself, the Court addresses alleged constitutional violations rather than following Petitioner's numbered claims.

### A. Knowing and Voluntary Guilty Plea

As noted, after his motions to suppress were denied, Petitioner entered a guilty plea to all charges, pursuant to a plea agreement with the State. A knowing and voluntary guilty plea "forecloses federal collateral review" of prior constitutional deprivations, including allegations of ineffective assistance of counsel that do not affect the voluntariness of the plea. See Fields v.

8

Att'y Gen. of Md., 956 F.2d 1290, 1294-96 (4th Cir. 1992); accord United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997); Wilson v. United States, 962 F.2d 996, 997 (11th Cir. 1992); Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983). "The focus of federal habeas inquiry is the nature of [defense counsel's] advice and the voluntariness of the plea, not the existence as such of an antecedent constitutional infirmity." Tollett v. Henderson, 411 U.S. 258, 266 (1973).

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann[ v. Richardson, [397 U.S. 759, 771 (1970)].

Id. at 267. When he has pled guilty at the advice of counsel, a petitioner must demonstrate that the advice was not "within the range of competence demanded of attorneys in criminal cases." McMann, 397 U.S. at 771; see also Blackledge v. Perry, 417 U.S. 21, 29–30 (1974). "Thus, the defendant who has pled guilty 'has no non-jurisdictional ground upon which to attack that judgment except the inadequacy of the plea,'" United States v. Moussaoui, 591 F.3d 263, 279 (4th Cir. 2010), as amended (Feb. 9, 2010) (quoting United States v. Bundy, 392 F.3d 641, 644-45 (4th Cir. 2004)), "or the government's 'power to bring any indictment at all,'" id. (quoting United States v. Broce, 488 U.S. 563, 575 (1989) (internal quotation marks omitted)) (additional citations omitted).

Petitioner does not allege that the trial court lacked jurisdiction to try him or to enter judgment against him. Nor does he challenge the State's power to "constitutionally prosecute" him. See Broce, 488 U.S. at 575. Although he raised a free-standing claim in his MAR that his plea was involuntary due to coercion by trial counsel and the court, see MAR (Doc. No. 16-8), at

9

4, Petitioner does not challenge the voluntariness of his plea as a ground for relief in his § 2254 Petition. Cf. Rule 2(c)(1), (2), Rules Governing § 2254 Cases, 28 U.S.C.A. foll. § 2254 (requiring that a habeas petition (1) specify all the grounds for relief available to the petitioner; and (2) state the facts supporting each ground). Instead, he argues that counsel's mishandling of the investigation of the Fourth and Fifth Amendment violations and the suppression hearing left him with no reasonable option but to plead guilty against his wishes or get a longer sentence by going to trial without the ability to present a defense. That argument, however, is the type of independent claim relating to a pre-plea deprivation of a constitutional right, in this case the 6th Amendment right to the effective assistance of counsel, that does not implicate the voluntariness of Petitioner's plea. See, e.g., United States v. Campa-Macias, 358 F. App'x 400, 401 (4th Cir. 2009) (unpublished) ("By pleading guilty Campa-Macias has waived all antecedent non-jurisdictional defects, including the denial of a motion to suppress." (citing Tollett, 411 U.S. at 267; United States v. Willis, 992 F.2d 489, 490 (4th Cir.1993)).

A guilty plea is valid when it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." Burket v. Angelone, 208 F.3d 172, 190 (4th Cir. 2000) (citing North Carolina v. Alford, 400 U.S. 25, 31 (1970)). Here, Petitioner's alternative courses of action were to plead not guilty and proceed to trial or to plead guilty. Petitioner does not allege that he pled guilty upon the advice of counsel, and he testified at the post-conviction evidentiary hearing that he had had no intention of proceeding to trial if the motions to suppress were denied. See MAR Hr'g Tr. (Doc. No. 16-11), at 208.

Although Petitioner does not challenge the voluntariness of his guilty plea as a ground for relief, he raises three claims that could implicate the voluntariness of his plea. The first is that counsel had an actual conflict of interest that adversely affected his performance (Ground Ten);

10

the second is that counsel was ineffective for failing to communicate a plea counter offer to the prosecutor (Ground Nine), and the third is that the State violated Petitioner's right to due process when it failed to produce exculpatory evidence supporting his claim that law enforcement officers searched his residence prior to obtaining a search warrant (Ground Four).

### 1. Ineffective Assistance of Counsel Standard

In <u>Strickland v. Washington</u>, the Supreme Court identified two necessary components of an ineffective assistance of counsel claim. 466 U.S. 668, 687 (1984). First, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Second, "the defendant must show that the deficient performance prejudiced the defense." <u>Id.</u> To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.

"[W]hen a petitioner's habeas corpus claim is based on alleged ineffective assistance of counsel[,] . . . [t]he AEDPA standard and the <u>Strickland</u> standard are dual and overlapping, and [the court] appl[ies] the two standards simultaneously rather than sequentially." <u>Lee v. Clarke,</u> 781 F.3d 114, 123 (4th Cir. 2015), as amended (Apr. 15, 2015) (quoting <u>Richardson v. Branker,</u> 668 F.3d 128, 139 (4th Cir. 2012)) (internal quotation marks omitted). Because both standards of review are " 'highly deferential' to the state court's adjudication . . . , 'when the two apply in tandem, the review is doubly so.' " <u>Lee,</u> 781 F.3d at 123 (quoting <u>Richardson,</u> 688 F.3d at 139).

### 2. Conflict of Interest

In Ground Ten of his habeas Petition, Petitioner claims that Mr. Clontz had an actual

11

conflict of interest that adversely affected his investigation of law enforcement's Fourth and Fifth Amendment violations and his handling of the suppression hearings. See Ground Ten, § 2254 Mem. (Doc. No. 2), at 34 ¶ 11. Petitioner presented the substance of some of Ground Ten in his MAR and AMAR, which the post-conviction court denied on the merits.

The Sixth Amendment right to effective assistance of counsel includes a duty of loyalty by counsel "that requires the attorney to remain free from conflicts of interest." Stephens v. Branker, 570 F.3d 198, 208 (4th Cir. 2009). To establish ineffective assistance of counsel based on a conflict of interest that was not raised before the trial court, the defendant must demonstrate that (1) counsel operated under "an actual conflict of interest" and (2) this conflict "adversely affected his lawyer's performance." United States v. Dehlinger, 740 F.3d 315, 322 (4th Cir. 2014) (quoting Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)). If the defendant satisfies this showing, prejudice is presumed, and the defendant need not demonstrate a reasonable probability that, but for counsel's conflicted representation, the outcome of the proceeding would have been different. United States v. Nicholson, 611 F.3d 191, 205 (4th Cir. 2010).

### a.    Co-defendant Jodi Brown

Petitioner claims Clontz had an actual conflict of interest due to his dual representation of Petitioner and Petitioner's co-defendant, Jodi Brown, and due to Clontz's "relationship-of-an-undisclosed-nature" with Brown. A petitioner demonstrates an actual conflict of interest when he shows that his counsel "actively represented conflicting interests." Sullivan, 446 U.S. at 350. "A defendant has established an adverse effect if he proves that his attorney took action on behalf of one client that was necessarily adverse to the defense of another or failed to take action on behalf of one because it would adversely affect another." Mickens v. Taylor, 240 F.3d 348, 360 (4th Cir. 2001) (en banc); see Jones v. Polk, 401 F.3d 257, 267 (4th Cir. 2005).

12

It is undisputed that Clontz was appointed on separate dates in May 2014 to represent both Petitioner and Jodi Brown.  At the post-conviction evidentiary hearing, Clontz testified that during the two months he represented both Petitioner and Brown, he visited Brown in jail on two occasions, in May 2014, because Petitioner was concerned Brown was not receiving adequate medical care for a wound on her arm, and that he (Clontz) did not discuss Petitioner's or Brown's case with Brown at any point.  Petitioner did not produce any evidence at the evidentiary hearing that disputed Clontz's testimony.  The following facts also are undisputed: 1) when the subject of Clontz's dual representation was raised at a July 2014 court proceeding, Clontz withdrew as Brown's attorney but not as Petitioner's attorney; 2) another attorney was appointed to represent Brown; 3) on November 19, 2014, the trial court heard and denied Petitioner's pro se motion to dismiss Clontz as his attorney; 3) on December 15, 2014, Brown pled guilty pursuant to a plea deal to charges of possession of precursor materials used in the production of methamphetamine; 4) as part of her plea deal, Brown agreed to testify for the State if Petitioner's case went to trial, and 5) as part of her plea deal, Brown's sentencing was continued until after she fulfilled her part of the plea bargain or Petitioner entered a guilty plea. Thus, Clontz's potential conflict of interest related to his dual representation of Petitioner and Brown was raised before the trial court, and Clontz withdrew from representing Jodi Brown.

Petitioner alleges, however, that notwithstanding Clontz's withdrawal of his representation of Brown, Clontz and Brown "had a relationship of an unspecified nature, . . . potentially while Petitioner was awaiting trial, and that said relationship was of an intimate enough nature that Mr. Clontz felt compelled to drive across town to give Ms. Brown money."  § 2254 Mem. (Doc. No. 2) at 34 ¶ 1.  There is nothing in the record before this Court showing Clontz had any contact with Jodi Brown between the date he withdrew as her counsel and the

13

date she entered her guilty plea, three months before Petitioner's suppression hearing. Nor was competent evidence produced at the post-conviction evidentiary hearing that Clontz had any contact with Brown between her guilty plea and the conclusion of Petitioner's case.

Finally, Petitioner has not identified any action Clontz took on behalf of Brown that was necessarily adverse to the Petitioner's defense. It is evident from Petitioner's MAR and federal pleadings that he believes the mere fact of Clontz's initial dual representation was sufficient to establish a disabling conflict of interest that required Clontz to withdraw as his attorney, as well as Brown's. See, e.g., MAR (Doc. No. 16-8), at ¶ 16 ("[T]he proper response to the Court's error in appointing Mr. Clontz to represent both parties would have been for the Court to dismiss him from both cases, or for him to withdraw from both cases."). That belief does not meet the standard articulated in Mickens v. Taylor, however, as Petitioner has failed to articulate how Clontz's withdrawal only as Brown's attorney was *necessarily* adverse to Petitioner's defense, see 240 F.3d at 360. Nor has Petitioner articulated how or why Brown would have been adversely affected had Clontz competently investigated and pursued suppression of evidence under the Fourth and Fifth Amendments in Petitioner's case. See id. Indeed, Petitioner does not even allege in his habeas Petition that Clontz acted to benefit Brown at Petitioner's expense.

Consequently, Petitioner has not alleged facts to support each element of a conflict of interest claim based upon Clontz's dual representation or alleged "relationship" with Brown. As such, Petitioner cannot demonstrate that the post-conviction court's rejection of his conflict of interest claim[1] was contrary to, or resulted in an unreasonable application of, clearly established

---

[1] Contrary to Petitioner's assertions, the state court addressed both factual predicates in post-conviction, see MAR Order (Doc. No. 16-9), at ¶¶ 1-17 (dual representation); Final MAR Order (Doc. No. 16-12), at ¶¶ 97-111 (alleged relationship between Clontz and Brown).

14

federal law as determined by the U.S. Supreme Court, see § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]" id. § 2254(d)(2). Respondent is entitled to summary judgment on this claim.

**b.    Breakdown in Communications**

Petitioner alleges Clontz had an actual conflict of interest based upon a breakdown in "attorney-client relations and communications." Ground Ten, § 2254 Pet. (Doc. No. 1), at ¶ A 10. Petitioner did not raise this as a legal theory in his MAR or AMAR, and Ground Ten of § 2254 does not provide any examples of a breakdown in Petitioner's and Clotnz's ability to communicate with each other. Nevertheless, it appears Petitioner's habeas claim is that Clontz's refusal to withdraw as counsel despite Petitioner's repeated requests that he do so, and Petitioner's frustration that Clontz was not pursing an investigation of Fourth Amendment violations at the pace and to the degree Petitioner wished, caused a breakdown in the attorney-client relationship, which, in turn, created a conflict of interest for Clontz. See, e.g., Ground Ten, § 2254 Mem., (Doc. No. 2), at ¶ 6.

Stated plainly, although Petitioner clearly was dissatisfied with Clontz, a defendant does not have an absolute right to the substitution of counsel, and to warrant substitute counsel a defendant must show "justifiable dissatisfaction" with counsel. United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994). "Justifiable dissatisfaction sufficient to merit substitution of counsel includes a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the client." United States v. Smith, 640 F/3d 580, 591 n. 4 (4th Cir. 2011) (citation and internal quotations omitted). As noted, Petitioner has not

15

provided any examples of a breakdown in communication between himself and Clontz.[2]  And, the Court notes, Petitioner clearly did not demonstrate a complete breakdown in communication to the trial court's satisfaction when it heard, and denied, Petitioner's pro se motion to dismiss Clontz as counsel on November 19, 2014.

To demonstrate an actual conflict of interest based upon a breakdown in the relationship between a defendant and his attorney, a petitioner "must show that [his] interests 'diverge[d] [from his attorney's] with respect to a material factual or legal issue or to a course of action.'" Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir. 1998) (en banc) (quoting Sullivan, 446 U.S. at 356 n. 3 (Marshall, J., concurring in part and dissenting in part)) (second alteration in original).  To show that the conflict adversely affected counsel's performance, a petitioner must show three things:  (1) there was a "plausible alternative defense strategy or tactic" that counsel could have pursued; (2) "the alternative strategy or tactic was objectively reasonable" based on the facts of the case known by the attorney when the tactical decision was made; and (3) "counsel's failure to pursue that strategy or tactic was linked to the actual conflict."  Mickens, 240 F.3d at 361.

As an initial matter, Petitioner does not identify a material factual or legal issue on which he and Clontz disagreed.  The record before this Court demonstrates that there were parallel defense strategies.  The first was to have all the evidence seized pursuant to the search and Petitioner's inculpatory statements excluded as "fruit of the poisonous tree," and the second was to negotiate a favorable plea deal.  Evidence produced at the suppression hearing and at the post-conviction hearing demonstrates that Clontz pursued both strategies, although his primary

---

[2] In Ground for Relief Nine, Petitioner alleges Clontz misunderstood the terms of the plea counter offer Petitioner wanted Clontz to propose to ADA Webster.  See Ground Nine, § 2254 Mem., (Doc. No. 2), at ¶¶ 12-17.  For reasons explained infra, that allegation is not supported by the record.

16

interest was in negotiating a favorable plea deal, and he pursued suppression of the evidence largely at Petitioner's insistence.  Petitioner, on the other hand, was convinced that law enforcement executed the search of his home without a warrant, and dissatisfied with what he perceived as Clontz's lack of zeal in pursing evidence to support that theory, he endeavored to run his own defense by, among other things, writing the various law enforcement agencies involved and demanding that they provide him audio, video, dashcam footage, and GPS data from the date of the search.[3]  At the same time, however, Petitioner attempted to negotiate a plea deal directly with ADA Webster, notwithstanding that Clontz was doing the same.

In sum, although Petitioner contends there was a breakdown in the attorney-client relationship that rose to the level of a conflict of interest for Clontz, he has failed to allege facts supporting each of the elements of a conflict of interest claim.  Rather, his claim is more accurately characterized as a run-of-the-mine ineffective assistance of counsel claim for pre-trial failure to competently pursue suppression of evidence.  Consequently, Petitioner's claim that Clonz rendered ineffective assistance of counsel due to a conflict of interest created by a breakdown in the attorney-client relationship is denied on the merits, and Respondent is entitled to summary judgment on this claim.

### 3.      Failure to Communicate Plea Counter-Offer

In Ground Nine, Petitioner claims trial counsel rendered ineffective assistance by refusing to inform the prosecutor that Petitioner would accept the State's offer of 66 to 92 months in prison, if the State would agree to recommend probation for Jodi Brown.  Petitioner ultimately agreed to a plea offer of 110 to 144 months in prison, after his motions to suppress

---

[3] Clontz filed motions for discovery seeking the same.

17

were denied. Petitioner contends the prosecutor would have accepted his counter offer had Clontz not refused to present it to the prosecutor.

Petitioner raised the substance of this claim in his MAR, and the post-conviction court held an evidentiary hearing on the claim. After considering the testimony of Clontz, ADA Webster, Petitioner, and Petitioner's wife, as well as Webster's representations in open court during Petitioner's March 31, 2015 plea proceeding where Petitioner and Clontz were present, the post-conviction court denied the claim on its merits. See Final MAR Order (Doc. No. 16-12), at 9-11. There was no dispute with respect to whether the prosecutor would have accepted the counter offer if it had been communicated to him, as Webster testified that he would have accepted it. Instead, the court found that neither Petitioner nor Petitioner's wife were credible "concerning [Petitioner's] alleged willingness to accept the State's plea offers prior to trial." Id. at 11 ¶ 162. The court found that:

> It is apparent that the defendant was insisting on a plea arrangement that contemplated a probationary sentence [for himself]. The State consistently tendered offers that required an active sentence and the defendant declined to accept those offers with knowledge of the lack of progress in the investigation of his preferred defense.

Id.

The Sixth Amendment right to counsel applies to the plea bargaining process, and prejudice occurs when, absent deficient advice, the defendant would have accepted a plea that the sentencing court would not have rejected, and "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler v. Cooper, 566 U.S. 156, 164 (2012). A component of the Sixth Amendment right to counsel is that counsel has a duty to communicate formal offers "from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye,

18

566 U.S. 134, 145 (2012). To show prejudice where a plea offer has lapsed or been rejected because of counsel's deficient performance, a defendant must demonstrate a reasonable probability that he would have accepted the earlier plea offer had he been afforded effective assistance of counsel. Id. at 147. Additionally, a defendant must show that "if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." Id. at 148.

The Supreme Court has never held that counsel has a duty to communicate a defendant's formal plea counter offer to the prosecution, and Petitioner does not allege Clontz failed to communicate one or more formal plea offers to him from the prosecutor. As such, the state post-conviction court's rejection of Petitioner's claim that Clontz violated his Sixth Amendment right to the effective assistance of counsel by failing to communicate a counter offer to the prosecutor could not have been contrary to clearly established federal law as decided by the U.S. Supreme Court. See § 2254(d)(1).

In determining whether a state court's rejection of a petitioner's ineffective assistance of counsel claim was based on an unreasonable determination of the facts unearthed at its own proceeding, the state court's findings of fact are presumed to be sound unless the petitioner "rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)). "The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was 'too powerful to conclude anything but [what the petitioner claims],' and when a state court's finding was 'clearly erroneous.'" Landers v. Warden. Atty. Gen. of Ala., 776 F.3d 1288, 1294 (11th Cir. 2015) (quoting Miller–El, 545 U.S. at 265). "Where the state

court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." Id. at 379.

The state post-conviction court made the following undisputed findings of fact: 1) the State's initial typed plea offer was dated May 14, 2014 and proposed that Petitioner plead guilty to all three counts in the indictment; the State would not seek an aggravated sentence or a 24-month enhancement based upon the aggravating factors alleged in the indictment; and the length of the sentence would be at the court's discretion; and 2) the offer was modified shortly thereafter to incorporate an agreement to a mitigated sentence of 66-92 months in prison. What also is not in dispute is that Petitioner rejected the 66-92 month offer when Clontz initially presented it to him.

Petitioner testified at the post-conviction hearing that "[a]fter about June," when he started becoming aware that Clontz "wasn't doing anything," Petitioner changed his position and told Clontz "on numerous occasions" that he would take the State's offer of 66-92 months in prison, if the prosecutor would agree to recommend some kind of probation for Jodi Brown. MAR Hr'g Tr. (Doc. No. 16-11), at 208:14-18. Petitioner testified further that the last of the conversations he had with Clontz about wanting the plea deal to include a probation recommendation for Brown was in November, when they were in court for some reason. See id. at 209:9-19. He testified that Clontz refused to take the counter offer to Webster because he believed it would make Webster mad. See id. at 208:24-209:8. Petitioner's wife testified that from April to November 2014, she made three or four calls to Clontz and informed him that

Petitioner wanted Clontz to accept, she thought, the 66 to 92-month offer with the condition of a recommendation of probation for Jodi.  See id. at 176:13-17; 177:9-22; 178:2-5.

The post-conviction court's conclusion that Petitioner's and Petitioner's wife's testimony on this issue was not credible finds ample support in the record.  First, during the months Petitioner (July through November 19, 2014) and Petitioner's wife (April to November 2014) purportedly were notifying Clontz of Petitioner's willingness to accept an active 66 to 92-month sentence if the State agreed to recommend probation for Brown, Petitioner was writing letters to the prosecutor, attempting to negotiate a plea deal on his own.  The court made factual findings that:  1) on July 24, 2014, Petitioner wrote a letter to ADA Webster extending a counter offer to plead guilty to four counts of possession of precursor chemicals and to accept four consecutive sentences, if those sentences were suspended and he was placed on probation for five years on the condition that he would receive state-assisted substance abuse treatment and counseling, see Final MAR Order (Doc. No. 16-12), at 9 ¶ 130; and 2) prior to the September 2014 Criminal Administrative court session, the defendant wrote to Webster with a different counter offer to plead guilty in exchange for a probationary sentence for himself and Jodi Brown, see id. at 9 ¶ 134.  Petitioner does not dispute either finding of fact.  To state the obvious, Petitioner did not offer in either letter to accept an active sentence on the condition that the prosecution recommend a probationary sentence for Brown.

Next, the post-conviction court made the factual finding that on November 14, 2014, Clontz, on behalf of Petitioner, extended a written plea offer to Webster under which Petitioner would plead to three counts of possessing precursor chemicals and receive three consecutive 22-month suspended sentences; and Petitioner would complete TROSA, a residential substance abuse treatment program, as a condition of probation.  See id. at 9-10 ¶ 135.  Petitioner does not

21

dispute that finding of fact, and when asked about it at the post-conviction hearing, he acknowledged that Clontz made the offer with his blessing, but he also asserted that Clontz was supposed to put the "probation contingent in that one too," but failed to do so. MAR Hr'g Tr. (Doc. No. 16-11), at 210:3-13. Petitioner's testimony further bolsters the post-conviction court's credibility determination. Even if he asked Clontz to put in a provision making the plea contingent upon a probation recommendation for Brown, Petitioner still was only agreeing to a suspended sentence for himself.

Moreover, notwithstanding Petitioner's misrepresentations of Clontz's testimony, Clontz consistently testified that Petitioner never told him that he (Petitioner) would take the 66 to 92-month active sentence if Jodi Brown received a probation recommendation from the State. See, e.g., MAR Hr'g Tr. (Doc. No. 16-11), at 84:1-5, 85:1-4, 86:16-87:6, 114:15-20. The post-conviction court found that Clontz testified Petitioner would not take anything the State had actually offered. See Final MAR Order (Doc. No. 16-12), at 10 ¶ 148.

Furthermore, at the conclusion of the suppression hearing and before Petitioner entered a guilty plea, Webster put on the record the plea offers the prosecution had made, and Clontz, with Petitioner present, confirmed that Webster's recitation of the plea offers was accurate. See Mar. 30-31, 2015 Hr'g Tr. (Doc. 16-3), at 154:22-155:24. Specifically, Webster stated that,

> [w]hile we were on the record in the November 17th trial term in front of the Honorable Judge Sumner, we put the defendant, Mr. Schnebelen, with Mr. Clontz on the record as to what his plea offer was at that time, which was a mitigated-range sentence that he declined. And, therefore, we withdrew that offer and decided to go to trial.

Id. at 155:2-7. Thus, Petitioner rejected outright the 66 to 92-month plea offer on November 17, 2014, and from the record, it appears he did so without telling the prosecutor he was willing to accept the plea if the State agreed to recommend probation for Brown, a deal Webster testified

22

he would have accepted.  Any argument that Petitioner was relying on Clontz to negotiate that deal with the prosecutor and that Clontz refused to do so holds no water given Petitioner's history of working around Clontz to try to get what he wanted.

Webster also stated that in the interim between November 17, 2014 and March 30, 2015, the State had made two other offers to Petitioner.  See id. at 155:10-16.  The first was an active sentence at the lower end of the presumptive range, which Webster indicated was 101 months. See id. at 12-14.  Then, the State "sweetened" the offer a little about a week before the suppression hearing, offering a 96-month minimum sentence.  Petitioner rejected both.  See id. at 14-16.

Finally, after the trial court denied the suppression motions and before entry of a guilty plea, ADA Webster, Clontz, and Petitioner had another discussion about a possible plea deal. Clontz testified at the post-conviction hearing that Petitioner told Webster he would have taken the 66-92 active sentence had he been assured Brown would get probation, and Webster responded that he would have agreed to that had he known Petitioner was insistent upon Brown receiving a probationary sentence.  MAR Hr'g Tr. (Doc. No. 16-11), at 89:23-90:12.  Clontz testified further that Petitioner asked why they could not agree on that plea deal right then, and Webster responded that it was too late.  Id. at 16.  It would not be unreasonable to expect some kind of reaction from Petitioner upon learning that the prosecutor would have accepted the counter offer Petitioner repeatedly had asked Clontz to present in 2014.  There was no testimony, however, that Petitioner explained or argued to Webster that he had asked Clontz to propose that plea deal in 2014 but Clontz had refused to do so.  Nor was there testimony that Petitioner confronted Clontz about how Clontz's refusal to present Petitioner's counter offer had cost him a favorable plea deal.

23

The facts do not support a finding of clear and convincing error in the post-conviction court's credibility determination. Based upon the facts in the record before it and the testimony given at the post-conviction hearing, it was not unreasonable for the state court to conclude that Petitioner was not willing to accept an active sentence prior to the suppression hearing. Petitioner has failed to demonstrate that the state court's rejection of his ineffective assistance of counsel claim was based on an unreasonable determination of the facts in light of the evidence, see § 2254(d)(2). Accordingly, Respondent is entitled to summary judgment on this claim, and the claim is denied.

### 4. **Brady** Claim

In Ground for Relief Four, Petitioner claims the State violated his right to due process when, contrary to the Supreme Court's holding in Brady v. Maryland, 373 U.S. 83 (1963), the prosecutor and law enforcement withheld exculpatory evidence supporting Petitioner's claim that officers searched his residence prior to obtaining a search warrant. Petitioner raised the substance of this claim in his MAR, but although the post-conviction court held an evidentiary hearing on the claim and made findings of fact relevant to it, the court failed to enter a specific ruling on the constitutional issue. Therefore, this Court decides Petitioner's Brady v. Maryland claim de novo.

At the heart of Petitioner's habeas petition is his belief that law enforcement began their search of his residence an hour to an hour and a half before obtaining a search warrant. Generally, warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions," Katz v. United States, 389 U.S. 347, 357 (1967) (footnote omitted), none of which apply in Petitioner's case. "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against

24

the victim of the illegal search and seizure." United States v. Calandra, 414 U.S. 338, 347 (1974). Moreover, "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." New York v. Harris, 495 U.S. 14, 19 (1990). "[E]vidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence." Segura v. United States, 468 U.S. 796, 815 (1984).

To prove Petitioner's theory in the state courts, the defense sought discovery of, among other things, GPS data on all Burke County Sheriff's Department ("BCSD") and Morganton Department of Public Safety ("MDPS") vehicles present at Petitioner's residential address at any time on April 12, 2014.[4] Petitioner alleges the prosecutor, the BCSD, and the MDPS falsely denied the existence of such GPS data. He alleges further that after his conviction, he discovered that the BCSD and the MDPS used "SunGard's OSSI Computer Aided Dispatch equipment and software in 2014, which included the use of Automatic Vehicle Locator (AVL) modules" that are, Petitioner contends, by nature of their functions and application, GPS devices. See Ground Four, § 2254 Pet. (Doc. No. 1), at ¶ A 14. Petitioner contends the requested GPS data would have definitively shown that officers arrived at and searched Petitioner's residence before obtaining the search warrant at 6:10 p.m. on April 12, 2014, as well as "clearly illustrating perjury, falsifying official records, and a number of other Constitutional and Statutory rights violations perpetrated by officials in this matter." Ground Four, § 2254 Mem. (Doc. No. 2), at 20 ¶ 5.

---

[4] The defense also requested dash-cam audio and video and audio and video from other sources, but in his federal habeas Petition, Petitioner claims a Brady violation only with respect to GPS data.

25

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Supreme Court subsequently extended the Brady v. Maryland disclosure rule to material impeachment evidence, Giglio v. United States, 405 U.S. 150, 154–55 (1972), and eliminated the requirement that a defendant must request exculpatory evidence to be entitled to its disclosure, United States v. Agurs, 427 U.S. 97, 107342 (1976).

Petitioner reliance on Brady v. Maryland is misplaced. Because the alleged Brady v. Maryland violation was antecedent to his guilty plea, Petitioner must demonstrate that the misrepresentations and the failure to disclose the purported GPS data rendered his guilty plea unknowing and involuntary. Such a claim is foreclosed, however, by the Supreme Court's opinion in United States v. Ruiz, 536 U.S. 622 (2002), which explicitly rejected that a guilty plea is involuntary merely because the prosecution failed to disclose impeachment evidence to the accused prior to the plea. See id. at 629 ("[I]mpeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary.") Thus, a court may accept a guilty plea as valid notwithstanding a prosecutorial failure to disclose evidence casting doubt on the credibility of government witnesses. See id. "The Brady [v. Maryland] right[ ] . . . is a trial right. . . . [It] exists to . . . minimize the chance that an innocent person would be found guilty. . . . When a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted." United States v. Moussaoui, 591 F.3d 263, 285 (2010) (citations omitted).

The evidence Petitioner cites here – GPS data –is akin to that addressed in Ruiz: impeachment evidence. Petitioner cannot show that GPS data would be exculpatory to him; that is, would show his innocence. Rather, such evidence, if it exists, would allow Petitioner to

26

discredit by inference Agent Chambliss's statements in the warrant affidavit and his testimony at the suppression hearing about the timing of the search. In other words, Petitioner would have sought to impeach Agent Chambliss's credibility, not use the evidence as affirmative proof of his own innocence.

In Brady v. United States, the Supreme Court stated the following regarding the voluntariness of guilty pleas:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

397 U.S. 742, 755 (1970) (quotation and quotation marks omitted). "The Supreme Court has held that government misrepresentations constitute impermissible conduct." United States v. Fisher, 711 F.3d 460, 465 (4th Cir. 2013) (citing Brady v. United States, 397 U.S. at 755). Accordingly, assuming without deciding that Brady v. United States applies here, to set aside his plea as involuntary, Petitioner must show that impermissible government conduct occurred. See id. at 757. In other words, he must first show that the prosecutor and law enforcement falsely claimed that no GPS data for April 12, 2014 existed.

On November 14, 2014, Sarah Ellis, of the MDPS records department, sent a letter to the defense, stating, among other things, that the MDPS did not "have any lojak/GPS devices" on any of its patrol vehicles. See Sarah Ellis Let. (Doc. No. 2, at 49). On March 30, 2015, the trial court held a hearing on a defense motion to compel discovery of, among other things, "GPS and LoJack recordings" of the vehicles present at the search and/or when Petitioner was arrested. See Mar. 30, 2015 Hr'g Tr. (Doc. No. 16-3), at 6:15-19. The judge held the hearing open to

27

allow the prosecutor to resolve whether the evidence requested in the defense motion for discovery was in the State's possession by and through its witnesses. See id. at 14:21-15:2.

When the hearing resumed, the prosecutor informed the judge that a BCSD Captain, who was present in the courtroom, had brought to the court everything the BCSD had related to the case; that the BCSD was not directly involved in the search; that the only BCSD involvement on April 12, 2014, was from around 7:45 p.m. to around 8:30 p.m. when one or more dogs were transported from Petitioner's residence to an animal shelter; and that the MDPS, the BCSD, and the prosecution had provided the defense everything they had related to the search and Petitioner's arrest on April 12, 2014. See id. at 17:22-20-1. The court concluded there was no evidence to suggest "the existence of camera footage or audio-video files or any additional dispatch records beyond what ha[d] been previously provided," and denied the motion for discovery, motion to compel discovery, and motion to continue based upon the State's failure to provide requested discovery. Id. at 43:1-16.

At the suppression hearing the next day, Petitioner testified that when law enforcement knocked on the door of his residence to begin their search, he "believe[d he] recall[ed] looking at [the clock on] the stove on the way out and it was between 4:30 and 5:00. [He was] not going to swear to that. But it was . . . certainly daytime[.]" Id. at 117:10-17. Under cross-examination, he contended that all the police reports and dispatch logs showing that officers first arrived at his residence almost an hour or more after the search warrant was secured were falsified. See id. at 148:2-8.

The post-conviction court held an evidentiary hearing on Petitioner's claim and based upon the testimony of Scott Rogers, a BCSD Captain subpoenaed by Petitioner's post-conviction attorney, made the following findings of fact: 1) Officers with the Burke County Narcotics Task

28

Force ("BCNTF") and the MDPS participated in the execution of the search warrant; 2) the vehicles utilized by the BCNTF in 2014 did not have GPS devices; 3) all the vehicles that responded to Petitioner's residence on April 12-13, 2014, other than the BCNTF vehicles, were MDPS vehicles; and 4) in 2014, the MDPS was testing vehicles with AVL devices. See Final MAR Order (Doc. No 16-12), at ¶¶ 9-12, 14-15. With all due respect to the state post-conviction court, it's finding that in 2014, the MDPS was testing vehicles with AVL devices, see id. at ¶ 14, if not clearly erroneous, is questionable. Rogers, the only witness at the evidentiary hearing who testified about the BCSD's or the MDPS's use, or lack thereof, of GPS or AVL systems, testified that the search of Petitioner's residence took place at a time "before any of the [AVL] systems were actually in place and running[, but he thought] Morganton *may* have begun some testing around that time." See MAR Hr'g Tr. (Doc. No. 16-11), at 9:6-9 (emphasis added).[5] Petitioner has failed to demonstrate that the post-conviction court's other findings of fact were clearly erroneous. Despite his assertion that after his conviction, he discovered the BCSD and the MDPS used AVL systems in 2014, he did not introduce any evidence at the post-conviction hearing to support that allegation.

In sum, the only evidence in the record before this Court that the State falsely claimed there was no GPS data available in April 2014 is Scott Rogers's testimony in November 2017 that the MDPS may have begun some AVL testing around that time. According to Sara Ellis's November 2014 letter to defense counsel, however, the MDPS did not have any lo-jack or GPS

---

[5] Rogers's testimony also contradicted another of the post-conviction court's findings of fact – that marked units operated by the Burke County Sheriff's Department had dash cameras and GPS tracking in 2014, see Final Order (Doc. No 16-12), at ¶ 10. Rogers testified that the marked patrol cars of the BCSD and the MDPS only had dash cameras in 2014. See MAR Hr'g Tr. (Doc. No. 16-11), at 8:24-9:18.

system on its vehicles at that time. Suffice it to say, Petitioner has failed to demonstrate that the State falsely claimed at the suppression hearing or the post-conviction hearing that there was no GPS data that could have been produced for April 12, 2014. Consequently, Petitioner cannot show that misrepresentations by the State induced his guilty plea, see Brady v. United States, 397 U.S. at 755. Respondent is entitled to summary judgment on this claim, and the claim is denied.

### 5.    Conclusion

Petitioner has failed to demonstrate that his guilty plea was unknowing and involuntary. For the reasons explained, supra, Petitioner has not shown that the post-conviction court unreasonably rejected his claims that Clontz provided ineffective assistance due to a conflict of interest and failure to communicate a plea counter offer to the prosecution. See § 2254(d)(1), (2). Nor has he demonstrated that Clontz had a conflict of interest based upon a breakdown in communication and the attorney-client relationship. Petitioner does not allege that Clontz failed to communicate plea offers from the State, failed to discuss various plea options with him, or advised him to reject the 66 to 92-month plea offer in favor of proceeding to trial or holding out for a better plea offer. And, Petitioner has not demonstrated that his guilty plea was induced by the State's misrepresentations about GPS data.

Petitioner does not allege that Judge Archie failed to conduct his plea hearing in compliance with federal constitutional principles. At the plea hearing, under questioning by Judge Archie, Petitioner denied that anyone had promised him anything other than what appeared in the plea agreement itself or had threatened him to plead guilty; acknowledged that Clontz had explained the charges to him, that he understood the nature of and each element of the charges, and that he and Clontz had discussed possible defenses to the charges; acknowledged that he understood the terms of the plea agreement and accepted the agreement;

30

and responded that he was entering his plea freely, fully understanding what he was doing, that he was pleading guilty, and that he was, in fact, guilty of the charges to which he was pleading. See Mar. 30-31, 2015 Hr'g Tr. (Doc. 16-3), at 159:6-162:3.

Finally, the fact that Clontz purportedly failed to investigate facts pertaining to the search warrant or failed to handle the suppression hearing competently does not implicate the voluntariness of Petitioner's plea. See Campa-Macias, 358 F. App'x at 401. Based on the record before it, this Court finds that Petitioner entered his guilty plea knowingly and voluntarily.

**B.      Claims of Antecedent Constitutional Violations**

With one or two exceptions, Petitioner's grounds for relief center on constitutional violations that allegedly occurred prior to the entry of his guilty plea. Federal habeas review of the following claims is foreclosed by Petitioner's knowing and voluntary guilty plea:

Ground One:  The police failed to establish the reliability of the information or the reliability of the source of the information relied upon to establish probable cause for the search warrant, in violation of the Fourth Amendment.

Ground Two:  The search warrant relied on false and misleading information in establishing probable cause and identifying the target of the search warrant, in violation of the Fourth Amendment.

Ground Three:  Petitioner's statements to officers were obtained in violation of the Fifth Amendment.

Ground Five:

1. The search warrant relied on false and misleading information in establishing probable cause and identifying the target of the search warrant, in violation of the Fourth Amendment;

2. Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, by failing to conduct an adequate investigation of whether the search warrant was supported by probable cause, relied upon false and/or misleading information to establish probable cause, or was obtained after law enforcement had searched Petitioner's house;

3. Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, by failing to timely subpoena witnesses for the suppression hearing, and failing to raise with the trial court, Mark Mitchell's disappearance from the courtroom on March 30, 2015 and Mitchell's absence on March 31, 2015;

4. The trial court violated Petitioner's right to compulsory process, in violation of the Sixth Amendment, when it refused to grant a defense motion to continue the suppression hearing;

5. The State violated Petitioner's right to due process under the Fourteenth Amendment when the prosecutor and lead investigator instructed Mark Mitchell to leave the courtroom on March 30, 2015, when they learned he was present to testify for Petitioner at the suppression hearing.

Ground Six:  Trial counsel rendered ineffective assistance, in violation of the Sixth Amendment, in his investigation of Petitioner's Fourth and Fifth Amendment claims, in his preparation for the suppression hearing, including securing of witnesses and evidence, and in his handling of the suppression hearing.

Ground Eight:  The trial court violated Petitioner's right to compulsory process under the Sixth and Fourteenth Amendments when it failed to grant a defense motion to continue the suppression hearing so that the defense could secure the presence of witnesses and the production of evidence.

Respondent is entitled to summary judgment on these claims, and they are dismissed with prejudice.

### C.    Fourth Amendment Claims

Alternate grounds exist for dismissal of Petitioner's Fourth Amendment claims.

Petitioner alleges in multiple grounds for relief: 1) that law enforcement officers searched his home prior to securing a search warrant; 2) that officers failed to establish the credibility of Mark Mitchell, who called and informed the police that there was a meth lab at Petitioner's home, or the reliability of the information he provided; 3) that the affiant for the warrant, State Bureau of Investigation (SBI) Special Agent Chambliss, knowingly used false and/or misleading information to establish the target of the search, 205 Jefferson Street, and knowingly used false and/or misleading information to establish probable cause for the warrant, in violation of the Fourth Amendment. Not only are these Fourth Amendment claims foreclosed on federal habeas review by Petitioner's guilty plea, they are barred for a second reason.

A freestanding Fourth Amendment allegation is not cognizable on federal habeas review. Stone v. Powell, 428 U.S. 465, 482 (1976); see also Haring v. Prosise, 462 U.S. 306, 320 (1983) (holding a valid guilty plea "results in the defendant's loss of any meaningful opportunity he might otherwise have had to challenge the admissibility of evidence obtained in violation of the Fourth Amendment"). Rather, Petitioner can only proceed with his Fourth Amendment claims if he can show that he was denied a full and fair opportunity to pursue his Fourth Amendment claims in state court. Stone, 428 U.S. at 494; Doleman v. Muncy, 579 F.2d 1258, 1265 (4th Cir. 1978) (applying Stone and holding that where a state court provides a mechanism under state practice to litigate Fourth Amendment claims, then this court "need not inquire further into the merits of the petitioner's case . . . unless the prisoner alleges something to indicate his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired").

In his July 17, 2014 Motion to Suppress all evidence seized pursuant to the search and all statements made by Petitioner and his co-defendant Jodi Brown, Petitioner argued the motion

33

should be granted because law enforcement officers who conducted the search failed to read the search warrant and give a copy of the warrant application and affidavit to either Petitioner or his co-defendant prior to undertaking the search, as required by N.C. Gen. Stat. §l5A-252. See July 17, 2014 Mot. to Suppress and Affidavit ("Aff."); R. on Appeal; Resp't's Ex. 1 (Doc. No. 16-2 at 7-28). Petitioner also questioned whether the warrant was executed prior to the search because as of the date the motion was filed, he had not received or even seen a copy of the warrant application and affidavit. See id.

The trial court held a hearing on Petitioner's multiple motions to suppress on March 31, 2015. Agent Chambliss and Burke County Narcotics Task Force Investigator Hester testified for the State and Petitioner testified in support of his motions. A copy of the search warrant, a copy of a newspaper article cited in the search warrant affidavit, a copy of handwritten notes from a law enforcement call with Mark Mitchell, a military time chart showing the time at which the sun set on April 12, 2014, and a copy of Petitioner's initialed and signed statement of Miranda rights were entered into evidence. At the conclusion of the hearing, the judge made findings of fact and conclusions of law, which she reduced to writing in a written order filed April 15, 2015, see Order on Suppress, Mots.; R. on Appeal (Doc. No. 16-2), at 60-63.

Petitioner contends his opportunity to pursue his Fourth Amendment claims in the state courts was impaired because: 1) the trial court refused to grant his motion to continue the suppression hearing so that he could secure witnesses subpoenaed by the defense who did not appear for the hearing and evidence requested by the defense that had not been produced by the State; 2) the prosecutor and Agent Chambliss forced Mark Mitchell, who had been subpoenaed by the defense and who did appear for the hearing, to leave before Petitioner's attorney could speak to him; and 3) the State refused to disclose GPS data the defense had requested that would

34

have supported Petitioner's allegations that Agent Chambliss did not secure the search warrant until after the search of Petitioner's house had begun. Petitioner alleges further that he could not appeal issues related to the suppression hearing and the trial court's orders denying his pre-trial motions because trial counsel failed to preserve those issues for appeal.

Petitioner, however, relitigated his original Fourth Amendment claims in his MAR and AMAR, and the post-conviction court either granted him a hearing on each claim or heard testimony relevant to each claim during the evidentiary hearing. Petitioner also litigated in post-conviction the factors he contends impaired his ability to pursue his Fourth Amendment claims at the suppression hearing and on direct appeal; the post-conviction court held an evidentiary hearing on those factors, as well. Lastly, Petitioner asserts that he raised his Fourth Amendment claims and the issues he contends impaired his ability to pursue them at the suppression hearing and on direct appeal, in his PWC to the NCCOA. Accordingly, this Court finds that Petitioner had a full and fair opportunity to litigate his Fourth Amendment claims in the state courts.

Therefore, Petitioner's claims that: 1) law enforcement officers searched his home prior to securing a search warrant; 2) officers failed to establish the credibility of Mark Mitchell or the reliability of the information he provided before using it in the warrant affidavit to establish probable cause; and 3) SBI Special Agent Chambliss knowingly used false and/or misleading information to establish the target of the search, 205 Jefferson Street, and knowingly used false and/or misleading information to establish probable cause for the warrant, in violation of the Fourth Amendment are not cognizable on federal habeas review because Petitioner had a full and fair opportunity to litigate these Fourth Amendment claims in the state courts. See Stone, 428 U.S. at 482. Consequently, Petitioner's Fourth Amendment claims are dismissed with prejudice on this basis, as well.

### D. Ineffective Assistance for Failing to Preserve Issues on Appeal

In Ground for Relief Seven, Petitioner claims trial counsel rendered ineffective assistance by failing to preserve his right to appeal the denial of his motions to suppress. Petitioner raised this claim in his MAR; the post-conviction court held a hearing on the claim and denied it on the merits, holding that Petitioner had failed to demonstrate he was prejudiced by Clontz's failure.

"[I]n order to properly appeal the denial of a motion to suppress after a guilty plea, a defendant must take two steps: (1) he must, prior to finalization of the guilty plea, provide the trial court and the prosecutor with notice of his intent to appeal the motion to suppress order, and (2) he must timely and properly appeal from the final judgment." Schnebelen, 788 S.E.2d 681 (quoting State v. Cottrell, 760 S.E.2d 274, 277 (N.C. Ct. App. 2014)) (internal quotation marks omitted). After Judge Archie entered her oral ruling denying the motions to suppress, Mr. Clontz noted Petitioner's objections to the Judge's findings of fact and her ruling on the motions. Clontz also entered a timely notice of appeal on Petitioner's behalf. What Clontz failed to do, however, was notify the trial court and prosecutor of Petitioner's intent to appeal the motion to suppress order or, in the alternative, make Petitioner's right to appeal the order a condition of his guilty plea.

Petitioner contends that he is entitled to have his judgment vacated without having to demonstrate prejudice under Strickland. See Ground Seven, § 2254 Mem. (Doc. No. 2), at 31 (citing Roe v. Flores-Ortega, 528 U.S. 470 (2000)); Resp. to Summ. J. Mot. (Doc. No. 20), at 20 (citing Flores-Ortega). The Supreme Court has long held that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." Flores-Ortega, 528 U.S. at 477. This is true even when a defendant has waived the right to appeal as part of a plea agreement. Garza v. Idaho, 139 S.Ct. 738, 747 (2019);

36

United States v. Poindexter, 492 F.3d 263, 273 (2007). To satisfy the prejudice prong of Strickland, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. "[W]hen counsel fails to file a requested appeal," however, "a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit." Peguero v. United States, 526 U.S. 23, 28 (1999) (citing Rodriquez v. United States, 395 U.S. 327, 329-330 (1969)).

The Supreme Court has not extended its holdings in Flores-Ortega or Rodriguez to situations where an attorney has timely filed an appeal on defendant's behalf. Nor has the Supreme Court held that when an attorney fails to preserve an issue for appeal, the defendant is entitled to a new appeal without having to show there is a reasonable probability that the appeal would have merit, see Strickland, 466 U.S. at 694. Consequently, the post-conviction court's rejection of Petitioner's claim that trial counsel rendered ineffective assistance when he failed to preserve Petitioner's right to appeal the denial of his motions to suppress, was not based upon a decision that was contrary to clearly established federal law. See § 2254(d)(1).

To succeed on this claim, Petitioner must demonstrate that the post-conviction court's conclusion that "[t]here is no reason to believe that the outcome of the defendant's appeal would have been any different if Clontz had preserved the defendant's right to appeal the[ ] suppression issues," Final MAR Order (Doc. No. 16-12), at ¶ 165, was itself based upon an unreasonable application of Strickland. See Lee v. Clarke, 781 F.3d at 123. In North Carolina, "the scope of appellate review of [a denial of a motion to suppress] is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the

37

judge's ultimate conclusions of law." State v. Mello, 200 N.C. App. 437, 439, 684 S.E.2d 483, 486 (N.C. Ct. App. 2009) (quoting State v. Cooke, 291 S.E.2d 618, 619 (N.C. 1982) (internal quotation marks omitted; alterations in original). "A trial court's factual findings are binding on appeal 'if there is evidence to support them, even though the evidence might sustain findings to the contrary.'" Id. (quoting Adams v. Tessener, 550 S.E.2d 499, 503 (N.C. 2001) (citations omitted)). The North Carolina appellate courts review the trial court's conclusions of law de novo. See id. (citing State v. Edwards, 649 S.E.2d 646, 648 (N.C. Ct. App. 2007)).

As noted, supra, at the conclusion of the suppression hearing, Judge Archie made oral findings of fact and conclusions of law in open court when denying the motions to suppress. See Mar. 30-31, 2015 Hr'g Tr. (Doc. No. 16-3), at 43. In an Order filed April 15, 2015, Judge Archie entered twenty-two (22) written findings of fact and six (6) conclusions of law in support of her decision to deny the motions to suppress. See Order on Mots. to Suppress, R. on Appeal (Doc. No. 16-2), at 60-63. In Ground for Relief Seven, Petitioner does not identify which of Judge Archie's findings of fact are not supported by competent evidence or which of Judge Archie's conclusions of law are not supported by her factual findings. See Ground Seven, § 2254 Pet. (Doc. No. 1), at 22-23; Ground Seven, § 2254 Mem. (Doc. No. 2), at 31.

Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts requires a petitioner to identify all the grounds for relief available to him and to state the facts that support each ground for relief. Rule 2(c), 28 U.S.C.A. foll. § 2254. Petitioner has failed to allege any facts in Ground for Relief Seven that would support a showing of prejudice under Strickland. There may be criticisms or challenges to the trial court's factual findings and/or conclusions of law scattered in his 29-page habeas Petition and/or his 36-page memorandum in support of his Petition, but it is not this Court's role to comb through those pleadings to locate

38

what it thinks Petitioner might consider factual allegations supporting Ground for Relief Seven. While pro se pleadings are held to a less stringent standard than those drafted by attorneys, see Erickson v. Pardus, 551 U.S. 89, 94 (2007); King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016), the liberal construction requirement does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court, see Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) (outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions").

Petitioner has failed to demonstrate that the post-conviction court's conclusion that "[t]here is no reason to believe that the outcome of the defendant's appeal would have been any different if Clontz had preserved the defendant's right to appeal the[ ] suppression issues," Final MAR Order (Doc. No. 16-12), at ¶ 165, was itself based upon an unreasonable application of Strickland. See Lee v. Clarke, 781 F.3d at 123. Consequently, Respondent is entitled to summary judgment on this claim, and the claim is denied.

## IV.    CONCLUSION

Petitioner entered a knowing and voluntary guilty plea, foreclosing federal habeas review of Grounds for Relief One-Three, Five-Six, and Eight. Petitioner has failed to demonstrate that the post-conviction court's rejection of his ineffective assistance of counsel claim for failing to preserve the suppression issues for appeal was contrary to or based on an unreasonable application, of clearly established federal law. See § 2254(d)(1). Respondent is entitled to summary judgment, and the habeas Petition shall be dismissed and denied.

**IT IS, THEREFORE, ORDERED** that:

1. Respondent's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**;

39

2. The Petition for Writ of Habeas Corpus (Doc. No. 1) is **DENIED and DISMISSED**; and

3. Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 474, 484 (2000) (holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

**SO ORDERED.**

Signed: June 1, 2020

Frank D. Whitney
Chief United States District Judge

40